| | |
|---|---|
| City of Minneapolis, | **Civil No. 10-CV-3312 (SRN/SER)** |
| Plaintiff, | |
| v. | **REPORT AND** |
| | **RECOMMENDATION** |
| Redflex Traffic Systems, Inc., | |
| Defendant. | |

Tracey N. Fussy, Andrea Kloehn Naef, Burt T. Osborne, Esqs., Minneapolis City Attorney's Office, 350 South Fifth Street, Room 210, Minneapolis, Minnesota 55415 for Plaintiff.

David L. Shulman, Craig A. Buske, Esqs., Law Office of David L. Shulman PLLC, 1005 Franklin Avenue West, Suite 3, Minneapolis, Minnesota, 55405 for Defendant.

STEVEN E. RAU, United States Magistrate Judge

This action arises out of a contract purportedly entered into by Plaintiff City of Minneapolis (the "City") and Defendant Redflex Traffic Systems, Inc. ("Redflex") in March 2005 (the "Contract") regarding the installation and operation of cameras for use in a traffic law enforcement program (the "Program"). Eight months after the execution of the Contract, litigation ensued. The Program spawned six primary lawsuits in state and federal court, and more than seven years after its establishment and termination, litigation continues.

The Program operated as intended for approximately one year. Following two lawsuits challenging the legality of the Program and its authorizing statute, the City shut it down. The City later was ordered to reimburse every individual who received a citation under the Program. Simultaneous to those lawsuits, the City and Redflex were defending a suit brought by Collins Electrical Systems, Inc., d/b/a ColliSys ("ColliSys"), a company one of Redflex's subcontractors

hired.  Although Redflex paid for the Program in full, Redflex's subcontractor failed to pay ColliSys.  ColliSys sued Redflex and the City seeking payment for its work, and ultimately collected from the City.

The City filed this action arguing that the Contract requires Redflex to indemnify and reimburse it for the costs and fees incurred in challenges to the legality of the Program and litigation associated with ColliSys.  It claims that Redflex's refusal to indemnify it is a breach of the Contract.  Redflex brought a counterclaim, arguing that the City's failure to require a payment bond constituted a breach of the Contract.  Specifically, Redflex alleges that the City failed to "[n]otify Redflex of any specific requirements relating to the construction and installation of any Intersection Approaches or the implementation of the Redlight Photo Enforcement Program," as required by the Contract.  The parties now present cross-motions for summary judgment.[1]  (Def.'s Mot. for Full and Partial Summ. J.) [Doc. No. 35]; (Pl.'s Mot. for Summ. J.) [Doc. No. 37].  The City seeks summary judgment on its claim for declaratory judgment that Redflex must indemnify it, its breach of contract claims, and equitable claims. Redflex seeks summary judgment on the City's claims and partial summary judgment on its counterclaim for breach of the Contract.

The City points to two sources providing its right to damages, the Contract and equity. Under Minnesota law, a contract executed for an installation like the Program requires a payment bond.  If no payment bond is obtained, that contract is not valid.  Neither Redflex nor the City secured a payment bond for the Contract.  While both parties expend inordinate energy and briefing on the issue of who was responsible for determining the necessity and ensuring the procurement of a payment bond, the energy produces no power and briefing results in

---

[1]     This matter has been referred to the undersigned for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1.

unnecessary paper usage. The net result, regardless of who was responsible for determining the necessity of a payment bond, is statutorily preordained—the Contract is not valid. Consequently, remedies flowing from it are unavailable. The City's equitable claims are also unavailing because traditional notions of equity prohibit relief for the City given its actions. Accordingly, the Court recommends that the City's Motion be denied and Redflex's Motion be granted in part and denied in part.

## I.  BACKGROUND

### A.  The Contractual Agreements

#### 1.  The Contract Between the City and Redflex

In September 2004, the City enacted Minneapolis Code of Ordinance §§ 474.620–.670, which provided that if a motor vehicle failed to stop at a red light on a traffic control signal, an automated traffic law enforcement system could detect the violation and a misdemeanor citation could issue to the vehicle's owner (the "Ordinance"). (Compl., Ex. 1 at ¶ 3, Attached to Notice of Removal) [Doc. No. 1]; (Answer and Countercl.) [Doc. No. 2 at 3]. Redflex designs and operates camera systems that automatically photograph vehicles driving through red traffic lights for use in enforcing motor vehicle laws like the Ordinance. (Def.'s Mem. of Law in Supp. of Mot. for Full and Partial Summ. J., "Def.'s Mem.") [Doc. No. 44 at 3]. It supplies such systems to over 260 government entities in North America. (Dep. Tr. of Aaron Rosenberg, Ex. UU at 9–10, Attached to Sixth Decl. of David L. Shulman, "Sixth Shulman Decl.") [Doc. No. 50].

On March 14, 2005, Redflex contracted with the City to install and operate traffic light enforcement cameras for the Program at designated intersections.[2] (Agreement Between the City of Minneapolis and Redflex Traffic Systems, Inc. (California) for Automated Red Light Photo Enforcement Cameras, "Contract," Ex. 2 at 1, Attached to Aff. of Tracey Fussy, "Fussy Aff.") [Doc. No. 40]. The Contract did not require the City to provide any money for the installation of cameras utilized for the Program. (*Id.* at Ex. B § 1). Redflex, "at [its] sole expense," was to complete the installation of the cameras, including "caus[ing] an electrical subcontractor to complete all reasonably necessary electrical work at the Designated Intersection[s]." (*Id.* at Ex. B. § 1.10). The Contract required Redflex to execute the Program by detecting and photographing moving violations, reviewing the photographs, providing the photographs to law enforcement for authorization to issue a citation, and then issuing and mailing citations. (*Id.* § 3.3). Redflex "warrant[ed] and represent[ed]" that it would provide these services "in a professional and workmanlike manner . . . , subject to the applicable law." (*Id.* § 5.1.2). According to the terms of the Contract, throughout the execution of the Program, Redflex remained the sole and exclusive owner of the Program and equipment. (*Id.* § 4.2).

In return for Redflex's installation and operation of the Program, the City paid a monthly fee. (*Id.* at Ex. D). The Contract also directed the City "at [its] sole expense" to "[n]otify Redflex of any specific requirements relating to the construction and installation of any Intersection Approaches or the implementation of the Redlight Photo Enforcement Program."

---

[2] The parties dispute the author responsible for certain portions of the Contract in an effort to argue that those portions must be construed against the other party pursuant to *contra proferentem*. (Def.'s Mem. at 3–5); (City of Minneapolis'[s] Mem. of Law in Opp.'n to Redflex's Mot. for Summ. J., "Pl.'s Mem. in Opp.'n") [Doc. No. 56 at 42–45]; (City of Minneapolis'[s] Reply in Supp. of the City's Mot. for Summ. J., "Pl.'s Reply Mem." [Doc. No. 62 at 3–4]. Because the Court's analysis is unaffected by the authorship of the Contract, it declines to analyze that issue.

(*Id.* at Ex. B. at § 2.3).  The Contract did not include a requirement that Redflex post a payment bond for the installation of the camera system.  Neither party acquired one.

In March of 2005, Burt Osborne ("Osborne"), an Assistant City Attorney, was the contract lawyer for the City Attorney's office.  (First Osborne Dep., Ex. B at 5–6, Attached to First Decl. of David L. Shulman in Supp. of Def.'s Mot. for Full and Partial Summ. J., "First Shulman Decl.") [Doc. No. 45].  Osborne's responsibilities included drafting contracts, assisting in negotiations of contract terms with contractors, and ensuring that City departments "follow[ed] all city procedures" and "major city policies" when procuring services.  (*Id.* at 6–7).  As a component of those responsibilities, Osborne determined the necessity of a payment bond for contracts.  (Second Osborne Dep., Ex. PP at 13–14, Attached to Fifth Decl. of David L. Shulman in Supp. of Def.'s Mot. for Full and Partial Summ. J., "Fifth Shulman Decl.") [Doc. No. 49].

Osborne assisted the City with the Contract.  He reviewed the Contract, understood all of the terms, and approved it as to form, meaning he believed it to be in compliance with the law and City policies.  (*Id.*).  He was familiar with the Minnesota statute requiring payment bonds on certain types of contracts, Minnesota Statute § 574.26, but determined it did not apply and, therefore, that a payment bond was unnecessary.  (*Id.*); (First Osborne Dep., Ex. B at 33–34, Attached to First Shulman Decl.).  Osborne testified that in this case if he were uncertain about the necessity of a payment bond, he would have consulted the City Attorney; he did not recall such a conversation.  (First Osborne Dep., Ex. B at 33–34, Attached to First Shulman Decl.).  In this instance, Osborne did not believe a payment bond was necessary because he understood Minnesota law to require a payment bond for goods, but not services.  (Trial Tr., Ex. C at 419, 423, 424, Attached for First Shulman Decl.).  Osborne concluded no payment bond was

necessary because the City was "not procuring something [it] was going to own" or a tangible good, but a service. (*Id.* at 424). If Osborne "believed a payment bond was required for this particular contract, . . . [he] would have included that." (Second Osborne Dep., Ex. PP at 14, Attached to Fifth Shulman Decl.).

<h3 style="text-align:center">2. The Subcontract and Sub-Subcontract</h3>

In April 2005, Redflex executed a subcontract with Network Electric, Inc. ("Network Electric") to assist in the installation of Redflex's camera systems for the Program (the "Subcontract"). (Compl. ¶ 18); (Answer and Countercl. ¶ 15). Redflex and Network Electric had worked together prior to that for other system installations around the country. Network Electric, in turn, contracted with ColliSys (the "Sub-Subcontract"). (Compl. ¶ 22); (Answer and Countercl. ¶ 17).

### B. Challenges to and Suspension of the Program and Amendment to the Contract

Minnesota state courts saw three primary lawsuits regarding the legality of the Program and the Ordinance. First, in *State v. Kuhlman*, the state supreme court concluded state law preempted the Ordinance. 729 N.W.2d 577, 580 (Minn. 2007). Second, in *State v. Adan*, the Hennepin County District Court dismissed all guilty pleas associated with citations issued under the Ordinance and ordered the City to "take all necessary action to decertify the convictions and refund all fines, surcharges, and law library fees" associated with the Ordinance. (*State v. Adan* Oct. 1, 2007 Order, Ex. 15 at 1, Attached to Fussy Aff.). Finally, in *Shapira et al. v. City of Minneapolis et al.*, a class of plaintiffs sued the City and the State of Minnesota, alleging that the imposition of fines under the Ordinance was unconstitutional. (*Shapira et al. v. City of Minneapolis et al.*, No. 06-cv-2190 (MJD/SRN), Compl., Ex. BB, Attached to Fourth Decl. of David L. Shulman in Supp. of Def.'s Mot. for Full and Partial Summ. J., "Fourth Shulman

Decl.") [Doc. No. 48]. The City Attorney and his staff handled the *Shapira* matter.[3] (Dep. Tr. of Lisa Needham, Ex. OO at 40, Attached to Fifth Shulman Decl.); (Dep. Tr. of James Moore, Ex. SS at 18, 119–20, Attached to Sixth Shulman Decl.). Following *Adan* and an unfavorable decision on appeal in *Kuhlman*, the City began settlement discussions with the *Shapira* plaintiffs and the state. (Dep. Tr. of Lisa Needham, Ex. 1 at 41–47, Attached to Fussy Aff.). After nearly a year of negotiation, the parties in *Shapira* reached settlement in September 2008. (Class Action Settlement Agreement, Ex. JJ at 15–16, Attached to Fifth Shulman Decl.); (Settlement Agreement Between State of Minnesota and City of Minneapolis, Ex. KK, Attached to Fifth Shulman Decl.). The City did not seek any input from Redflex about the terms of the settlement. (Pl.'s Answers to Def.'s First Set of Reqs. For Admis., Ex. MM ¶ 2, Attached to Fifth Shulman Decl.). The City claims that in connection with the *Shapira* it paid a total of approximately $1,333,509.70. (Pl.'s Mem. at 12). Those alleged damages, however, were never disclosed in the City's Rule 26(a) disclosures. Nor were those disclosures ever amended or supplemented.

In response to these challenges, the City and Redflex executed an amendment to the Contract in August 2006. (First Amendment of Agreement Between the City of Minneapolis and Redflex Traffic Systems, Inc. (California) for Automated Red Light Photo Enforcement Cameras, Ex. AA, Attached to Fourth Shulman Decl.). They chose to suspend the Program, in

---

[3]       Redflex claims the City's defense made a number of strategic decisions with which Redflex appears to disagree. Redflex argues that those decisions potentially affected the City's liability in *Shapira* and also increased the associated costs incurred. The allegedly erroneous decisions include: settlement on a class basis and settlement terms with the State of Minnesota regarding the process by which class members were reimbursed and administrative costs. (Def.'s Mem. at 17–19). Redflex also takes issue with the City's failure to seek any input from it about the terms of settlement prior to entering into the settlement agreement. (*Id.*). Redflex notes that it "has faced constitutional challenges to the use of its system in other states and always prevailed against those challenges. . . . [and] Redflex has also prevailed in every class action case it has been involved in." (*Id.* at 17).

hopes that a change in state law would permit the use of the cameras in the future. (Dep. Tr. of

Barbara Johnson, Ex. RR at 22, Attached to Sixth Shulman Decl.).

## C. The *ColliSys* Litigation

Apart from the challenges to the legality of the Program, the City and Redflex were

simultaneously defending ColliSys's lawsuit regarding Network Electric's failure to pay them

under the Sub-Subcontract. Problems between Network Electric and ColliSys arose even before

challenges to the legality of the Program and the Ordinance—less than six months after

execution of the Contract. Litigation related to ColliSys continued long after the legality

challenges concluded, however.

### 1. Factual Background

In June 2005, two months after executing the Subcontract, Network Electric requested

that Redflex direct a payment of $158,000 to St. Francis Electric ("St. Francis"), a Network

Electric subcontractor, for work St. Francis performed on a similar installation in California.

(Compl. ¶ 23); (Answer and Countercl. ¶ 18); (Tr. of Jury Trial Proceedings Volume II of IV,

Ex. 6 at 170, Attached to Fussy Aff.). St. Francis did not perform any work on the Project, and

Redflex had already paid Network Electric in full for the California installation. (Compl. ¶ 23);

(Answer and Countercl. ¶ 18). Nonetheless, Redflex made the payment to St. Francis as

Network Electric requested, and deducted the amount from Network Electric's outstanding

Project invoices. (Compl. ¶ 23); (Answer and Countercl. ¶ 18).

ColliSys performed installation work on the Program from May to July of 2005 and

submitted invoices to Network Electric. (Aug. 7, 2006 Mem. and Order, Ex. D at 3, Attached to

First Shulman Decl.). In September 2005, ColliSys informed Redflex that Network Electric

failed to make payments due to ColliSys under the Sub-Subcontract and owed it $394,957 for the

Project. (Dep. Tr. of Alan Boe, Ex. 5 at 40–42, Attached to Fussy Aff.); (Aug. 7, 2006 Mem. and Order, Ex. D at 3, Attached to First Shulman Decl). At that time, Redflex owed Network Electric $203,997 for the Project. (Aug. 7, 2006 Mem. and Order, Ex. D at 3, Attached to First Shulman Decl.). In response to the notification from ColliSys, Redflex sought and obtained permission from Network Electric to pay $100,000 directly to ColliSys in October 2005. (*Id.* at 3–4). Redflex withheld the remaining $103,997 due to Network Electric "because [it] was concerned that there were other unpaid subcontractors." (*Id.* at 4).

On November 23, 2005, Redflex deposited the $103,997 with the United States District Court-District of Minnesota and brought an interpleader action, *Redflex Traffic Syss., Inc. v. Network Elec., Inc. et al.*, No. 05-cv-2702 (RHK/JJG), 2006 WL 2265159 (D. Minn. Aug. 7, 2006), seeking direction as to whom to pay for the electrical work. (*Id.*). Redflex brought the action against ColliSys, Network Electric, and "XYZ Corporations" (companies who performed materials or labor in connection with the installation of the Program). (*Id.*). The Honorable Richard H. Kyle released $98,530 to ColliSys and awarded the remaining $5,467 to Redflex for attorney's fees and costs incurred. *Redflex Traffic Syss., Inc.*, 2006 WL 2265159, at *4. ColliSys then obtained a default judgment against Network Electric for $294,957 in federal court. (Am. J. by Default, Ex. E, Attached to First Shulman Decl.).

### 2. Initiation of Suit

A little less than a year after Redflex's initiation of the interpleader action, ColliSys commenced an action in Hennepin County District Court against Redflex and the City seeking the remaining sum owed for work on the Project. *Collins Elec. Syss. v. Redflex Traffic Syss., Inc.* (*ColliSys*), 2008 WL 933488, at *1 (Minn. Ct. App. Apr. 8, 2008); (*ColliSys* Summons and Compl., Ex. F, Attached to First Shulman Decl.). ColliSys brought a claim against Redflex and

the City to foreclose on mechanic's liens it filed against the real estate to which its labor and materials were provided. *ColliSys*, 2008 WL 933488, at *1; (*ColliSys* Summons and Compl., Ex. F at ¶¶ 16–28), Attached to First Shulman Decl.). ColliSys also brought separate claims against both the City and Redflex. It alleged the City violated Minnesota Statute § 574.29, the Minnesota Public Contractors Performance and Payment Bond Act, by failing to require a payment bond for the installation of the Program. (*ColliSys* Summons and Compl., Ex. F at ¶¶ 33–38, Attached to First Shulman Decl.). It also claimed Redflex was unjustly enriched by making the third-party payment to St. Francis, instead of to Network Electric or ColliSys. (*Id.* ¶¶ 29–32). As in *Shapira*, the City controlled its own defense.[4] (Dep. Tr. of Lisa Needham, Ex. OO at 40, Attached to Fifth Shulman Decl.); (Dep. Tr. of James Moore, Ex. SS at 18, Attached to Sixth Shulman Decl.).

Redflex and the City moved to dismiss. The district court dismissed all of ColliSys's claims, concluding that

> (1) Redflex acquired no property interest in the real property upon which [ColliSys] filed its mechanic's liens; (2) the real property against which [ColliSys] filed its mechanic's liens cannot be subject to the mechanic's liens because of the common-law "public use" exemption; (3) [ColliSys] failed to plead any facts showing that Redflex was unjustly enriched . . .; and (4) [ColliSys] failed to plead that Network [Electric] was insolvent at the time it defaulted on its obligation.

*ColliSys*, 2008 WL 933488, at *1. ColliSys appealed. *Id.*

---

[4]       Redflex claims the City's defense made a number of strategic decisions with which Redflex appears to disagree. Redflex argues that those decisions potentially impacted the City's liability and increased the *ColliSys* litigation costs. The allegedly erroneous decisions include: failure to take deposition of the Network Electric representative, failure to serve written discovery on Network Electric, failure to point out discrepancy in claimed damages in responding to motion for judgment as a matter of law, selection of attorney in responding to motion for judgment as a matter of law, failure to take timely appeal of the liability judgment, and failure to present evidence regarding attorney's fees to court. (Def.'s Mem. at 11, 13–15).

### 3. First Appeal, Remand, and Second Appeal

The Court of Appeals affirmed dismissal of ColliSys's mechanic's lien claim, but reversed as to the Bond Act and unjust enrichment claims. *Id.* at *3, 6. On the Bond Act claim, the Court of Appeals found that ColliSys adequately pleaded that Network Electric was insolvent at the time of its default to ColliSys.[5] *Id.* at *3. As for the unjust enrichment claim against Redflex, the Court of Appeals reversed on the ground that facts could conceivably be discovered that would show Redflex had been unjustly enriched at ColliSys's expense as a consequence of the St. Francis payment. *Id.*

At the conclusion of discovery on remand, the City and Redflex moved for summary judgment on all of ColliSys's claims. The court granted Redflex's motion as to the unjust enrichment claim, but denied the City's motion on the Bond Act claim. (Order and Mem. Re: Summ. J., Ex. K at 1, 16–17, Attached to Second Decl. of David L. Shulman in Supp. of Def.'s Mot. for Full and Partial Summ. J., "Second Shulman Decl.") [Doc. No. 46]. The court found there were fact issues concerning whether the installation of the Redflex system was a "public work" within the meaning of the Act and, thus, subject to the requirement that a payment bond be posted. (*Id.* at 1, 17–20). The court also concluded a fact issue existed on the question of whether Network Electric was insolvent at the time of its default to ColliSys. (*Id.* at 17, 21–22).

---

[5]     This is relevant because "[a] plaintiff seeking to hold a public body liable for failing to obtain a payment bond for contracted work must show that the contractor was insolvent when it defaulted on its obligation to the plaintiff." *ColliSys*, 2008 WL 933488, at *2 (citing *Green Elec. Sys., Inc. v. Metro. Airports Comm'n*, 486 N.W.2d 819, 823 (Minn. Ct. App. 1992), *review denied* (Minn. Aug. 27, 1992)).

ColliSys's claims against the City proceeded to a jury trial in Hennepin County District Court in April 2009. The jury returned a defense verdict for the City, finding the Program was a public work, but that Network Electric was not insolvent at the time of default to ColliSys. (Special Verdict Form, Ex. M at 2, Attached to Second Shulman Decl.).

On May 11, 2009, ColliSys moved for judgment as a matter of law or for a new trial on the issue of Network Electric's solvency at the time of default. (Mem. in Supp. of Mots. for J. as a Matter of Law or for a New Trial, Ex. N, Attached to Second Shulman Decl.). The court found Network Electric was insolvent at the time it defaulted and granted the motion for judgment as a matter of law. (Notice of Filing Order and Mem. Granting Pl.'s Mot. for J. as a Matter of Law, Ex. Q, Attached to Shulman Decl.). The court ordered that judgment be entered against the City in the amount of $163,516.48 on July 8, 2008. (*Id.*). On September 30, 2009, the district court awarded ColliSys $181,804 in attorney's fees and costs pursuant to Minnesota Statute § 574.26. (Order and Mem. Re: Pl.'s Request for Att'y Fees and Costs, Ex. U, Attached to Shulman Decl.)

On November 20, 2009, the City filed a Notice of Appeal to the Court of Appeals regarding the judgment on liability and damages, as well as the award of attorney's fees. (Def.'s Mem. at 14). The Court of Appeals dismissed the City's appeal of the judgment on liability and damages as untimely, but found the City's appeal as to the award of attorney's fees and costs was timely and allowed the appeal to proceed on that basis alone.[6] (Jan. 20, 2010 Order, Ex. W, Attached to Shulman Decl.).

---

[6] The appealability provisions of Minnesota Rules of Appellate Procedure 103.03 and 104.01 governed the City's appeal. Those rules identify the types of judgments and orders that may be appealed and require that appeal be taken within 60 days of entry of a judgment. Minn. R. App. P. 103.03, 104.01. The City's Notice of Appeal was filed 135 days after the district court's entry of judgment on liability for $163,516.48, but only 51 days after the court's decision on attorney's fees and costs.

#### 4. Settlement

In February 2010, the City and ColliSys began settlement discussions. (Feb. 9–10, 2010 Email Exchange, Ex. Y, Attached to Third Decl. of David L. Shulman in Supp. of Def.'s Mot. for Full and Partial Summ. J., "Third Shulman Decl.") [Doc. No. 47]. The City considered settlement favorable in comparison to incurring additional attorney's fees pursuing the appeal. (Dep. Tr. of James Moore, Ex. SS at 68, Attached to Sixth Shulman Decl.). On February 9, 2010, the City agreed to settle the matter for $350,161.24, the sum of the liability judgment and the fees and costs award, plus interest. (Feb. 9–10, 2010 Email Exchange, Ex. Y at 6, Attached to Third Shulman Decl.). The Minneapolis City Attorney requested and received the Minneapolis City Council's approval of the settlement on March 4, 2010. (Mar. 4, 2010 Req. for City Council Committee Action from the City Att'y Office, Ex. Z, Attached to Third Shulman Decl.).

#### D. Indemnification Notice from the City

On March 5, 2010, the City sent a letter to Redflex C.E.O. Karen Finley seeking indemnification. (March 5, 2010 Letter, Ex. NN, Attached to Fifth Shulman Decl.). The letter requested reimbursement for $345,320, the amount the City paid to settle the *ColliSys* litigation, and $92,796, the alleged cost of settling *Shapira* one and a half years earlier in September 2008. (Letter Dated March 5, 2010, "March 5, 2010 Letter," Ex. NN at 4–5, Attached to Fifth Shulman Decl.). The City directed Redflex to contact it immediately if it had objections to the settlement of *Shapira*. (March 5, 2010 Letter, Ex. NN at 5, Attached to Fifth Shulman Decl.). Redflex denied any obligation to indemnify or reimburse the City and four months later the City commenced this action. (Compl. at 12).

## II.     DISCUSSION

The parties' respective breach of the Contract claims are premised on the validity of the Contract.  The validity of the Contract, however, is predicated on a number of requirements under Minnesota Statute § 574.26, including the procurement of a payment bond.  While not explicitly stated, each of the parties' alleged breaches can be attributed to the absence of a payment bond.  Where parties fail to obtain a payment bond, as here, a contract subject to § 574.26 is not valid and any remedies provided for therein are unavailable.  Because the Contract was subject to § 574.26 and the parties failed to procure a payment bond, the City's declaratory judgment and breach of contract claims, and Redflex's counterclaim fail.

As an alternative theory of recovery for the costs associated with *ColliSys*, the City also pleaded two equitable claims: contribution and equitable subrogation.  These claims fail because to seek equity, the City must do equity.  The City was the architect of this litigation chaos.  The City was positioned to protect itself from liability in the *ColliSys* litigation by requiring that a payment bond accompany the Contract, but did not make that demand.  Further, the City exercised exclusive control over its defense it *ColliSys* and did not confer with Redflex in any way.  Equity does not permit the City to shift the burden to Redflex to recover for losses the City incurred where Redflex is forever foreclosed from asserting influence over the defense and potentially reducing liability.

### A.     Standard for Summary Judgment

Federal Rule of Civil Procedure 56 provides that summary judgment shall issue if the pleadings, depositions, interrogatory answers, admissions, and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883–84 (1990).

On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. *Lujan*, 497 U.S. at 903; *Ludwig v. Anderson*, 54 F.3d 465, 470 (8th Cir. 1995). The nonmoving party may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995) (citation and quotation omitted).

Where, as here, the Court confronts cross-motions for summary judgment, this approach is only slightly modified. When considering the City's Motion, the Court views the record in the light most favorable to Redflex. When considering Redflex's Motion, the Court views the record in the light most favorable to the City. "Either way, summary judgment is proper if the record demonstrates that there is no genuine issue as to any material fact." *Sachsenmaier v. Supervalu, Inc.*, No. 10-cv-4868 (SRN/AJB), 2012 WL 1313495, at *4 (D. Minn. Apr. 17, 2012) (citation and quotation omitted).

**B.    Breach of Contract Claims (Counts I, II, and V and Redflex's Counterclaim)**

The City asserts Redflex is liable to it for indemnification and reimbursement of the costs and damages it incurred in *Shapira* and *ColliSys*. Redflex's alleged liability for those sums is based on the following indemnification provisions in the Contract:

> 8.1 **INDEMNIFICATION BY REDFLEX.** Subject to Section 8.3, Redflex agrees to defend and indemnify the Customer … against, and to protect, save and keep harmless the [Customer] from, and to pay on behalf of or reimburse the [Customer] as and when incurred for, any and all liabilities, obligations, losses, damages, penalties, demands, claims, actions, suits, judgments, settlements, costs, expenses, and disbursements . . . of whatever kind and nature . . . , which may be imposed on or incurred by any [Customer] arising out of or related to (a) any material misrepresentation, inaccuracy or breach of any covenant, warranty or representation of Redflex contained in this Agreement, or (b) . . . any and all legal liability based on any and all civil, criminal and administrative actions challenging the legality or constitutionality of the [Program] . . . , (c) any claim,

action or demand not[7] caused by Redflex's failure to perform its obligations under this Agreement, or (d) any claim, action or demand challenging the Customer's use of the [Program] or any portion thereof, the validity of the results . . . , or the validity of the Citation issued, prosecuted and collected . . . , or (e) any claim, action or demand challenging Redflex's failure to maintain the [Program] or any portion thereof.

8.2 **INDEMNIFICATION BY CUSTOMER.** Subject to Section 8.3, the Customer hereby agrees to indemnify Redflex . . . for . . . all Losses which may be imposed on or incurred by any Redflex Party arising out of (a) any material breach of this Agreement.

8.3 **INDEMNIFICATION PROCEDURES.** In the event any claim, action or demand (a "Claim") in respect of which any party hereto seeks indemnification from the other, the party seeking indemnification (the "Indemnified Party") shall give the party from whom indemnification is sought (the "Indemnifying Party") written notice of such Claim promptly after the Indemnified Party first becomes aware thereof, provided, however, that failure so to give such notice shall not preclude indemnification with respect to such Claim except to the extent of any additional or increased Losses or other actual prejudice directly caused by such failure. The Indemnifying Party shall have the right to choose counsel to defend such Claim (subject to the approval of such counsel by the Indemnified Party, which approval shall not be unreasonably withheld, conditioned or delayed), and to control, compromise and settle such Claim, and the Indemnified Party shall have the right to participate in the defense at its sole expense; provided, however, the Indemnified Party shall have the right to take over the control of the defense or settlement of such Claim at any time if the Indemnified Party irrevocably waives all rights to indemnification from and by the Indemnifying Party. The Indemnifying Party and the Indemnified Party shall cooperate in the defense or

---

[7]     The parties dispute whether the inclusion of the word "not" in this provision was intentional. (Def.'s Mem. at 4, 30–31); (Pl.'s Mem. in Opp.'n at 2–4, 43–45); (Def.'s Reply Mem. in Supp. of Mot. for Full and Partial Summ. J.) [Doc. No. 60. at 8–10]; (Pl.'s Reply Mem. at 3–4). Although this issue has no bearing on the Court's recommendation, it is addressed briefly. "The cardinal purpose of construing a contract is to give effect to the intention of the parties as expressed in the language they used in drafting the whole contract." *Art Goebel, Inc. v. N. Suburban Agencies, Inc.*, 567 N.W.2d 511, 515 (Minn. 1997). "The plain and ordinary meaning of the contract language controls, unless the language is ambiguous." *Bus. Bank v. Hanson*, 769 N.W.2d 285, 288 (Minn. 2009). Further, the language of the contract must be read as a whole and in a manner that gives meaning to all of its provisions. *Brookfield Trade Ctr., Inc. v. Cnty. of Ramsey*, 584 N.W.2d 390, 394 (Minn. 1998). Contract terms may not be construed to yield a harsh or absurd result. *Id.* The inclusion of "not" in this section creates liability on the part of Redflex for any and all claims against the City **not** caused by Redflex's failure to fulfill its contractual obligations. (Contract, Ex. 2 §§ 8.1–.3, Attached to Fussy Aff.). This is an absurd result given the nature of the Contract. Suffice to say, the inclusion of the word "not" in that provision was obviously an inadvertent error.

settlement of any Claim, and no party shall have the right to enter into any settlement agreement that materially affects the other party's material rights or material interests without such party's prior written consent, which consent will not be unreasonably withheld or delayed.

(Contract, Ex. 2 §§ 8.1–.3, Attached to Fussy Aff.).  Redflex argues that the City waived any indemnification or reimbursement to which it may have been entitled under the Contract by controlling its own defense in *Shapira* and *ColliSys*.[8]  Redflex further asserts that there can be no breach of contract as to these terms because the Contract was not valid pursuant to Minnesota Statute § 574.26.  Although the invalidity of the Contract was not pleaded affirmatively in Redflex's Answer, the requirement of a payment bond under § 574.26 and the failure to secure such a bond have been central to this case since its inception more than two years ago. Consequently, Redflex may raise invalidity as an affirmative defense now.  Because neither party procured a payment bond, the Contract is invalid pursuant to Minnesota law.

### 1.  Timeliness of Redflex's Invalidity Defense

The Federal Rules of Civil Procedure require a responsive pleading to set forth "any avoidance or affirmative defense," including certain enumerated defenses.  Fed. R. Civ. P. 8(c). The City notes correctly that Redflex failed to raise invalidity of the Contract under § 574.26 in a timely filed responsive pleading.  (Pl.'s Mem. in Opp.'n at 45–49).  Regardless of the explicit language of Rule 8(c), the Eighth Circuit observed:

The Supreme Court has indicated that the Rule 8(c) pleading requirement is intended to give the opposing party both notice of the affirmative defense and an opportunity to rebut it.  *Grant v. Preferred Research, Inc.*, 885 F.2d 795, 797–98 (11th Cir. 1989) (citing *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 350 (1971)).  [The Eighth Circuit], therefore, **eschew[s] a literal interpretation of the Rule that places form over substance**, *Thomas v. St. Luke's Health Sys., Inc.*, 869 F. Supp. 1413, 1428–29 (N.D. Iowa, 1994), *aff'd per*

---

[8]     Even if the Court were to conclude that the Contract was valid and enforceable, a serious fact question exists as to whether the City waived its right to indemnification under the terms of the Contract and, if so, the extent of any ensuing prejudice to Redflex.

*curiam*, 61 F.3d 908 (8th Cir. 1995) (unpublished table decision), and instead ha[s] held that "[w]hen an affirmative defense is raised in the trial court in a manner that does not result in unfair surprise, . . . technical failure to comply with Rule 8(c) is not fatal." *Financial Timing Publ'ns, Inc. v. Compugraphic Corp.*, 893 F.2d 936, 944 n.9 (8th Cir. 1990) [(citation and quotation marks omitted)].[FN5]

> FN5. Consequently, where the circumstances merit it, we have accepted and favorably cited affirmative defenses first raised at various stages of litigation. *See, e.g.*, *Sanders v. Dep't of the Army*, 981 F.2d 990, 991 (8th Cir. 1992) (per curiam) (finding that the district court did not abuse its discretion by allowing an affirmative defense to be raised for the first time in a motion to dismiss); *Stoebner v. Parry, Murray, Ward & Moxley*, 91 F.3d 1091, 1093–94 (8th Cir. 1996) (per curiam) (citing favorably a 9th Circuit opinion allowing an affirmative defense to be raised for the first time in a summary judgment motion when there is no prejudice); *Coohey v. United States*, 172 F.3d 1060, 1064 n.8 (8th Cir. 1999) (recognizing that "an affirmative defense can even be raised on appeal where the evidence supports that defense.").

*First Union Nat'l Bank v. Pictet Overseas Trust Corp.*, 477 F.3d 616, 622 (8th Cir. 2007) (emphasis added).

Even if neither party acknowledged explicitly the invalidity defense prior to the instant Motions, the parties' filings, as well as discovery, afforded the City sufficient notice of the applicability of Minnesota Statute § 574.26. Any claim of unfair surprise or prejudice over Redflex's assertion of the defense at this stage in the litigation is not credible. Indeed, issues related to the failure to secure a payment bond, the party at fault for that failure, and the effect of § 574.26 have been central to this case since its inception. The Complaint and the Answer state that neither party procured a payment bond as Minnesota Statute § 574.26 requires. (Compl. ¶¶ 20, 46–51, 54); (Answer and Countercl. at 6–7). The City claims it was Redflex's obligation to obtain the payment bond and cites its failure to do so as the basis for its equitable claims and one of its breach of contract claims. (Compl. ¶¶ 46–62). In its counterclaim, Redflex argues it was the City's responsibility to notify it that a payment bond was necessary and that its failure to do

so was a breach of contract. (Answer and Countercl. at 6–7). Furthermore, all facts relevant to the defense have been on the record and undisputed since before the filing of the Complaint. Indeed, the City's liability under § 574.29 for failing to secure a payment bond was a critical issue in *ColliSys*.

The City's only response to the claimed invalidity defense here is its untimeliness. (Pl.'s Mem. in Opp.'n at 45–49). The City has not shown that inclusion of the invalidity defense would unfairly surprise or prejudice it. Even if the Complaint and Answer did not preserve the invalidity defense properly, this Court still has discretion to grant leave to amend the Answer to include this defense.[9] *See Sanders v. Dep't of Army*, 981 F.2d 990, 991 (8th Cir. 1992). The Court therefore recommends consideration of the invalidity defense as properly pleaded.

This case is readily distinguishable from *Outsource Services Management, LLC v. Ginsberg*, No. 08-cv-5897 (DWF/FLN), 2010 WL 5088190 (D. Minn. Dec. 7, 2010), a case the City cites for the proposition that unpleaded defenses are barred at the summary judgment stage. First and foremost, the defendants in *Outsource Services Management* expressly waived the defenses they sought to raise. *Outsource Servs. Mgmt.*, 2010 WL 5088190, at *14. No such waiver is present here. Second, the defendants there did not demonstrate that the unpleaded defenses truly applied to afford them protection. *Id.* In contrast, in this case, the plain language of the applicable statute provides that the Contract is "not valid." Minn. Stat. § 574.26. Finally, although the Judge Frank concluded that the failure to plead the affirmative defenses precluded defendants from "raising a belated, unpleaded defenses this late in the litigation," it is unclear whether the complaint and answer foreshadowed the defense and its factual bases in *Outsource*

---

[9] Even if the parties proceeded to trial, pleadings may be amended during trial or even after judgment to include an issue tried by the parties' express or implied consent, but not raised in the pleadings. Fed. R. Civ. P. 15(b). While not "tried by consent," there is no question that both parties litigated the issue in the course of discovery and motion practice.

*Services Management*—a sharp contrast to the pleadings exchanged between Redflex and the City.

### 2. The Contract Is Not Valid Pursuant to Minnesota Statute § 574.26

The application of Minnesota Statute § 574.26 is dispositive of the City's declaratory judgment and breach of contract claims and Redflex's counterclaim. When interpreting a statute, a court's role is to discover and effectuate the legislature's intent. *Current Tech. Concepts, Inc. v. Irie Enters., Inc.*, 530 N.W.2d 539, 543 (Minn. 1995). In doing so, Minnesota courts "construe technical words according to their technical meaning and other words according to their common and approved usage and the rules of grammar." *Id.* (citation omitted); *see* Minn. Stat. § 645.08 (listing the canons of construction governing interpretation of Minnesota's statutes). When the language of a statute is not ambiguous and the legislature's intent is clearly manifested by the plain and unambiguous language of the statute, statutory construction is neither necessary nor permitted. *Ed Herman & Sons v. Russell*, 535 N.W.2d 803, 806 (Minn. 1995); *see also* Minn. Stat. § 645.16 ("When the words of a law in their application to an existing situation are clear and free from all ambiguity, the letter of the law shall not be disregarded under the pretext of pursuing the spirit."). In such a case, a court must apply the plain meaning of the statute. *Current Tech. Concepts, Inc.*, 530 N.W.2d at 543 (citation omitted). "A statute is ambiguous if it is reasonably susceptible to more than one interpretation." *Id.* (citation omitted).

In 2005, Minnesota Statute § 574.26 mandated that:

**Subd. 2. Terms.** Except as provided in sections 574.263 and 574.264 or if the amount of the contract is $75,000 or less, **a contract with a public body for the doing of any public work is not valid unless the contractor gives** (1) a **performance bond** to the public body with whom the contractor entered into the contract, for the use and benefit of the public body to complete the contract according to its terms, and conditioned on saving the public body harmless from

20

all costs and charges that may accrue on account of completing the specified work, **and** (2) **a payment bond** for the use and benefit of all persons furnishing labor and materials engaged under, or to perform the contract, conditioned for the payment, as they become due, of all just claims for the labor and materials. Reasonable attorneys' fees, costs, and disbursements may be awarded in an action to enforce claims under the act if the action is successfully maintained or successfully appealed.

Minn. Stat. § 574.26, subd. 2 (2005) (emphasis added). This statute is unambiguous. A contract with the City for the performance of a public work exceeding $75,000 in 2005 was not valid unless accompanied by a performance bond and a payment bond.[10] Stated differently, the failure to obtain a payment bond vitiated an otherwise valid contract. Thus, if the Project was valued at over $75,000 and was a public work, the Contract required a payment bond to be valid. Neither party disputes that the value of the Project was well over $75,000.

The *ColliSys* jury determined the Project was a public work. (Special Verdict Form, Ex. M at 2, Attached to Second Shulman Decl.). Under the Full Faith and Credit Statute, 28 U.S.C. § 1738, a federal court generally must afford a state court's determination the same preclusive effect that it would receive in the state's own courts. *Marrese v. Am. Acad. of Orthopedic Surgeons*, 470 U.S. 373, 380 (1985); *Teleconnect Co. v. Ensrud,* 55 F.3d 357, 361 (8th Cir. 1995); *see also* Restatement (Second) of Judgments § 86. The Court therefore looks to Minnesota law to determine if collateral estoppel should apply to the issue of whether the Project was a public work.

Pursuant to Minnesota law, collateral estoppel prevents parties from re-litigating an issue where:

> (1) the issue was identical to one in a prior adjudication; (2) there was a final judgment on the merits; (3) the estopped party was a party or in privity with a

---

[10] The current version of Minnesota Statute § 574.26 references § 471.345 for the dollar figure over which a contract with a public body requires a payment bond, $100,000. Minn. Stat. § 471.345, subd. 3 (2012).

party to the prior adjudication; and (4) the estopped party was given a full and fair opportunity to be heard on the adjudicated issue.

*Hoyt v. Goodman*, No. 10-cv-3680 (SRN/FLN), 2012 WL 1094438, *5 (D. Minn. Apr. 2, 2012) (citing *Pope Cnty. Bd. of Comm'rs v. Pryzmus*, 682 N.W.2d 666, 669 (Minn. Ct. App. 2004)).

Neither party offered arguments to counter the conclusion that collateral estoppel applies to the question of whether the Project constituted a public work within the meaning of Minnesota Statute § 547.26. The issue was submitted to the *ColliSys* jury specifically, which concluded it was a public work. Although the jury's determination regarding Network Electric's solvency at the time of default was later reversed, the jury's conclusion that the Program was a public work remained unchanged and final. (Special Verdict Form, Ex. M at 1, Attached to Second Shulman Decl.); (Mem. in Supp. of Mots. for J. as a Matter of Law or for a New Trial, Ex. N, Attached to Second Shulman Decl.); (Notice of Filing Order and Mem. Granting Pl.'s Mot. for J. as a Matter of Law, Ex. Q at 5, Attached to Shulman Decl.). As a defendant in *ColliSys*, the City had a full and fair opportunity to be heard on this issue. Thus, Minnesota's collateral estoppel law precludes the parties from re-litigating the *ColliSys* jury's determination. *See Hoyt*, 2012 WL 1094438, at *5. By its terms then, 28 U.S.C. § 1738 prohibits the parties from litigating that issue again in federal court, and the Project is presumed a "public work" within the meaning of Minnesota Statute § 574.26 for purposes of this analysis.[11]

Accordingly, to be valid, the Contract must have been accompanied by a performance bond and a payment bond. Minn. Stat. § 574.26, subd. 2. Neither party obtained a payment bond for the Project and, therefore, the Contract is not valid. The Court recommends granting

---

[11]     Furthermore, neither party challenges the Project's designation as a public work in this litigation. To the contrary, the parties concede the point by structuring their arguments around the application of § 574.26. Their pleadings endorse the basic notion that payment bond was necessary and appropriate.

Redflex's Motion to the extent it seeks summary judgment on the City's declaratory judgment and breach of contract claims; denying Redflex's Motion to the extent it seeks summary judgment on its counterclaim; and denying the City's Motion on its declaratory judgment and breach of contract claims.[12] *See Septran, Inc. v. Indep. Sch. Dist. No. 271, Bloomington, Minn.*, 555 N.W.2d 915, 921 (Minn. Ct. App. 1996) (affirming district court's decision finding contract void under § 574.26 for failure to procure a performance bond and granting summary judgment against both parties on their claims under the contract).

### C.    Equitable Claims (Counts III and IV)

The Complaint asserts two equitable claims as alternative theories of recovery for the costs associated with the *ColliSys* litigation: contribution and equitable subrogation.[13]  When courts act in equity, they have broad discretion in fashioning relief. *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814–15 (1945); *City of Cloquet v. Cloquet Sand & Gravel, Inc.*, 251 N.W.2d 642, 644 (Minn. 1977).  That discretion enables a court to balance the relative equities and hardships, and to tailor relief to the unique circumstances of a case to achieve justice. *See City of Cloquet*, 251 N.W.2d at 279.  Despite the City's admission that it determined Minnesota Statute § 574.26 was inapplicable to the Contract and, therefore, decided not to require a payment bond, it seeks to hold Redflex liable for the costs flowing from that decision.  Ultimately, it asserts Redflex is liable for the costs of the City's defense in *ColliSys*, despite the fact that the City exercised exclusive control over that defense.  In raising these

---

[12]     The City raised claims for breach of the implied covenant of good faith and fair dealing and breach of contract for failure to comply with Minnesota Statute § 337.10 in its memorandum. (Pl.'s Mem. at 17–20, 29–30, 30–31).  Regardless of whether these claims were pleaded improperly as Redflex asserts, they fail because the Contract is not valid. *See Septran, Inc.*, 555 N.W.2d at 921.

[13]     The Complaint does not assert similar equitable claims for the City's other alleged damages.

claims, the City attempts to find equitable relief from problems of its own creation. Because the purposes of equity would not be served by granting the City's requested relief, the Court recommends denial of the equitable claims.

This matter invokes an important maxim: a party seeking equity must do equity and come to the court with clean hands. *Hruska v. Chandler Assocs., Inc.*, 372 N.W.2d 709, 715 (Minn. 1985). This fundamental principle "is far more than a mere banality." *Brennan v. Carroll*, 111 N.W.2d 229, 245 (Minn. 1961) (citation and quotation omitted). A party's misconduct warranting denial of equitable relief "need not be of such a nature as to be actually fraudulent or constitute a basis for legal action." *Hruska*, 372 N.W.2d at 715 (citation and quotation omitted). Rather, the doctrine of unclean hands denies equitable relief to a party whose conduct was unconscionable due to a bad motive or where the result induced by that party's conduct will be unconscionable either in benefit to himself or injury to others. *Id.* Whether anyone other than the party seeking equitable relief acted with unclean hands is irrelevant. *Heidbreder v. Carton*, 645 N.W.2d 355, 371 (Minn. 2002).

Although not explicitly stated, the Answer asserts affirmative defenses grounded on the principle of unclean hands.[14] In conjunction with the facts provided in the pleadings and other filings in this matter, the Court construes these affirmative defenses as an assertion of unclean hands and finds it is pleaded properly for consideration here. *See First Union Nat'l Bank*, 477 F.3d at 622; *see also Sanders*, 981 F.2d at 991 (finding that even if an answer did not properly

---

[14] Four of Redflex's eight affirmative defenses allege actions or omissions by the City that constitute inequitable conduct and could be sufficient to preclude recovery under the unclean hands doctrine. Specifically, Redflex pleaded that "[t]he City failed to mitigate its damages" (Answer and Countercl. ¶ 49); "[t]he damages of the City were caused in whole or in party by its own negligent and unlawful conduct" (*Id.* ¶ 49); "[t]he claims of the City are barred by the doctrines of laches, estoppel, and waiver" (*Id.* ¶ 52); and "[t]he claims of the City are barred by its failure to comply with the Indemnification Procedures of the Contract" (*Id.* ¶ 54).

preserve a defense, the court had the discretion to grant leave to amend the answer to include the omitted defense). The general principles of equity outlined above and the unclean hands doctrine guide the Court's decision on these claims. The City had the opportunity to protect itself and avoid the damages complained of at two important, related instances: formation of the Contract and during the *ColliSys* litigation. It failed to do so and equity will not shield it from the consequences of those failures.

During the negotiation and execution of the Contract, the City could have required a payment bond. Had it done so, it would not have incurred the damages complained of in this matter. The City is a sophisticated party that previously executed contracts for public works within the meaning of Minnesota Statute § 574.26. Here, it acted with the advice of Osborne, its legal counsel. Osborne was aware of the requirements of Minnesota Statute § 574.26 and, as a component of his job as the City's contract attorney, regularly made determinations regarding the applicability of § 574.26 to contracts. He concluded, in error, that § 574.26 did not apply to the Contract and, therefore, a payment bond was unnecessary. The City stood by that determination and, failing to require a payment bond accompany the Contract, did not protect itself.

Regardless of whether a statute or contract imposed a duty on the City to determine the necessity of or to ensure the procurement of the payment bond, it had the opportunity and means to protect itself by insisting that a payment bond accompany the Contract. The mistaken determination that the statute did not apply to the Contract is not an adequate basis for equitable relief. Equity does not exist to correct the errors of sophisticated parties acting in the regular course of business. It exists to balance hardships and assist parties who either could not or reasonably should not have been expected to protect themselves adequately at law. There are no such inequities in the City's favor, no injustice to be corrected. Rather, the City's mistaken

understanding of the law and subsequent decision not to require a payment bond resulted in its damages. It now turns to the Court claiming innocence and requesting a judgment to correct its blunder. The Contract did not include a provision requiring a payment bond, exactly as the City intended. Equity will not shield it from the unintended consequences of that intentional decision.

Further, the City's actions during *ColliSys* foreclose the equitable relief sought. The City admits it controlled its defense in *ColliSys* to the exclusion of Redflex. (Dep. Tr. of Lisa Needham, Ex. OO at 40, Attached to Fifth Shulman Decl.); (Dep. Tr. of James Moore, Ex. SS at 18, 59, Attached to Sixth Shulman Decl.). Despite its role as co-defendant to Redflex, the City never tendered the defense to Redflex or conferred regarding its strategy. Then, after agreeing to the settlement terms, it presented the bill to Redflex demanding payment of $345,320. (March 5, 2010 Letter, Ex. NN at 4–5, Attached to Fifth Shulman Decl.).

In effect, the City requests equitable relief to recover the costs of defense and indemnification for *ColliSys*. Unlike the conventional scenario, however, the City never requested defense or indemnification from Redflex, and Redflex never decided any of the issues that a party defending or indemnifying another traditionally determines. Throughout the litigation, the City remained silent about any defense or indemnification allegedly owed it.[15] It controlled its own defense and, arguably, made some errors in strategic decisions along the way.[16] Equity does not require Redflex to reimburse the City on these facts.

_____

[15] The City notes correctly that a cross-claim against Redflex for contribution was not compulsory. (Pl.'s Mem. in Opp.'n at 30). The strategic choice to not advance a cross-claim for contribution or equitable subrogation, however, is a different issue than the City's failure to raise their claimed right to defense and indemnification from Redflex.

[16] For a list of the strategic decisions that Redflex alleges were in error, see *supra* footnote 4.

This is not a situation in which the City is seeking to recover because Redflex shirked its responsibility to defend or indemnify it. While it is apparent that Redflex knew of the suit as a co-defendant, the City never requested defense or indemnity from Redflex.[17] Further, Redflex had no influence over the City's defense or strategic decisions, including settlement. This Court will not exercise its discretion to find that, in equity, Redflex must foot the bill where the City failed to raise the issue of defense or indemnification, proceeded with its own defense, never sought Redflex's input on strategic decisions, and then sought reimbursement at the conclusion of the litigation.

That is not to say Redflex was a purely innocent bystander to this debacle. It could have raised the issue of payment bond with the City during contract negotiations or inquired about indemnification in *Shapira* or *ColliSys*. Redflex remained silent as well, avoiding the issue and, presumably, the task of the City's defense. Nevertheless, in determining whether the City is entitled to equitable relief, "it is irrelevant whether anyone other than [the City] acted with 'unclean hands.'" *Heidbreder*, 645 N.W.2d at 371. Redflex's bad behavior does not excuse the City's.

Although the evidence and record do not suggest that the City acted with a bad motive, to permit its recovery as to these claims would be an unconscionable benefit to it and injury to Redflex. In denying the City's request for relief as to these claims, this Court does precisely what equity enables it to do: exercise its discretion in awarding relief after balancing the equities and hardships. The City was the party best suited to protect itself against damages complained

---

[17] The City claims that it remained silent because, pursuant to the Contract, Redflex had "the *right* to control the defense of a case and the City ha[d] the *right to take over* from Redflex control of the defense." (Pl.'s Opp.'n Mem. at 40). According to the City, because Redflex never asserted control over *ColliSys*, the City never "took over" control from Redflex. (*Id.*). Even if the Contract were valid and these provisions controlled, this argument is overly formalistic and unpersuasive.

of here.  It could have required that a payment bond accompany the Contract; it failed to do so.  Then, when litigation resulted from the lack of a payment bond, the City controlled its defense exclusively without conferring with Redflex.  Accordingly, the Court recommends denial of recovery for the costs associated with *ColliSys* in equity.

### D.     $1.2 Million in Damages Sought by the City

Notwithstanding the recommendation made herein, one issue regarding the City's claimed damages merits note.  As a seeming afterthought, the City asserted in its memorandum in connection with its Motion that it was entitled to recover the over $1.2 million refunded to those who received citations under the Ordinance as a part of the *Shapira* settlement.  (Pl.'s Mem. at 11–12); (Pl.'s Reply at 17–18).  Although this Court need not decide the issue, it briefly addresses the pleading of these claimed damages.

The City was required to disclose the calculation of its damages in its initial disclosures.  *See* Fed. R. Civ. P. 26(a)(1)(A)(iii) (requiring as part of the initial disclosures "a computation of each category of damages claimed by the disclosing party.").  The Rules impose a continued duty to supplement those disclosures "in a timely manner" if the party learns that the disclosure is incomplete or incorrect in some material aspect.  Fed. R. Civ. P. 26 (e)(1)(A).  If a party fails to provide or supplement evidence as Rule 26 requires, it is not allowed to use that information on a motion, at a hearing, or at trial unless the failure was substantially justified or harmless.  Fed. R. Civ. P. 37(c)(1).

The Eighth Circuit has set forth four factors the Court should consider in determining whether a failure to disclose was substantially justified or harmless: (1) the importance of the excluded material; (2) the explanation for failing to comply with the disclosure rules; (3) the potential prejudice from allowing the material to be used at trial; and (4) the availability of a

continuance to cure such prejudice. *Citizens Bank v. Ford Motor Co.*, 16 F.3d 965, 966 (8th Cir. 1994). In addition, "[f]or litigation to function efficiently, parties must provide clear and accurate responses to discovery requests. Parties are entitled to accept answers to previous interrogatories as true, and to refrain from seeking additional discovery directed to the same issue." *ELCA Enters., Inc. v. Sisco Equip. Rental & Sales, Inc.*, 53 F.3d 186, 190 (8th Cir. 1995) (internal quotations and citations omitted).

The Complaint made general reference to the City's obligation to return the money it received under the Ordinance as a result of the *Shapira* settlement. (Compl. ¶¶ 35–36). In the prayer for relief, the City sought reimbursement "for all losses, settlements, judgments, costs and expenses" incurred in *Shapira*. (*Id.* at 11). The $1.2 million in reimbursement costs, however, were not a component of the City's claimed damages in its Rule 26(a) disclosures. The "computation of all damages claimed by [the City]" in its Rule 26(a) initial disclosures estimated damages related to the settlement of *Shapira* at only $92,795.99. (Pl.'s Rule 26(a) Disclosures, Ex. WW, Attached to Seventh Decl. of David L. Shulman in Opp.'n to Pl.'s Mot. for Summ. J., "Seventh Shulman Decl.") [Doc. No. 55 at 4]. The City never supplemented its disclosures or the damages claimed in its Rule 26(a) disclosures. According to the Federal Rules, it may only refer to these damages if its nondisclosure was substantially justified or harmless.

The undisclosed reimbursement damages are important in that they add substantially to the City's claimed relief—the sum is more than ten times the *Shapira* cost-related damages claimed in the City's Rule 26(a) disclosures. Despite the value in relation to other damages sought, the City failed to present a reasonable explanation for its failure to disclose or supplement its damages. Also, just as in its Rule 26(a) disclosures, the City estimated the *Shapira* damages were approximately $92,000 in discovery. In response to an interrogatory

requesting itemization of "all of the City's damages claimed in this case," the City noted it "paid $92,795.99 to resolve the *Shapira* case." (Pl.'s Answers to Def.'s First Set of Interrogs., Ex. TT at 4, Attached to Sixth Shulman Decl.). It made no mention of the reimbursement of the fines. Similarly, in its Rule 26(f) report, the City claimed damages of "approximately $500,000" and attorney's fees and costs in defending the *Shapira* and *Collins* lawsuits. (Rule 26(f) Report) [Doc. No. 8 at 2]. Indeed, the City's memorandum provides its first explicit demand for reimbursement of the $1.2 million paid in fines. Redflex was entitled to rely on the City's disclosures, discovery responses, and representations in the Rule 26(f) Report regarding the value of the claims, without supposing how the City might later attempt to frame its claims to multiply the damages claimed.

Furthermore, Minnesota courts concluded the City was not entitled this sum. The *Kuhlman* court found state law preempted the Ordinance under which the fees were collected. 729 N.W.2d at 580. In *Adan*, the state court ordered the City to "take all necessary action to decertify the convictions and refund all fines, surcharges, and law library fees" associated with the Ordinance. (*State v. Adan* Oct. 1, 2007 Order, Ex. 15 at 1, Attached to Fussy Aff.). Thus, according to state courts, the City is not entitled to the fines as a matter of law. To allow it to now seek to collect the fines would be an affront to justice and equity.

The City's claim of damages for fines, re-styled as a component of the "losses, settlements, judgments, costs and expenses" incurred in *Shapira*, is unpalatable. It cannot attempt at this stage in the litigation to dramatically increase the damages sought by seeking recovery of a sum to which the state courts found it was not entitled. In this Court's view, the City's failure to comply with the Federal Rules was not substantially justified or harmless.

## III. RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant Redflex Traffic Systems, Inc.'s Motion for Summary Judgment [Doc. No. 35] is **GRANTED in part** and **DENIED in part**.

   a. To the extent Defendant's Motion seeks Summary Judgment as to Plaintiff's claims, it is **GRANTED**.

   b. To the extent Defendant's Motion seeks Summary Judgment as to its counterclaim, it is **DENIED**.

2. Plaintiff City of Minneapolis's Motion for Summary Judgment [Doc. No. 37] is **DENIED**.

Dated: January 10, 2013

<i>s/ Steven E. Rau</i><br>
STEVEN E. RAU<br>
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by **<u>January 24, 2013</u>**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.